**NOT FOR PUBLICATION**                                                          **CLOSED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TOWNSHIP OF PISCATAWAY, EDWIN MARKANO, et al., | : : : | Hon. Faith S. Hochberg |
| Plaintiffs, | : : | Civil Action No. 01-4828 (FSH) |
| v. | : : | **OPINION** |
| SPECTRA ENERGY, | : : : : | October 7, 2008 |
| Defendant. | : : | |

**HOCHBERG, District Judge**.

**I.    INTRODUCTION**

Plaintiffs seek to enjoin Defendant from removing certain trees from the street where Plaintiffs are homeowners. Defendant asserts that removal of specified trees and shrubs is reasonably necessary to the safe maintenance of three natural gas pipelines, owned and maintained by Defendant pursuant to an easement that runs underneath the street and lawns of the Plaintiffs. In response, Plaintiffs assert that removal of the trees is not reasonably necessary under the terms of the easement. Plaintiffs also argue that Defendant is barred by the doctrine of laches from seeking to remove the trees because from the time the trees were planted in the late 1960s until the late 1990s, Defendant never objected to the presence of the trees nor warned about their eventual removal.

1

Pursuant to Rule 39(c) of the Federal Rules of Civil Procedure, the Court empaneled an advisory jury to hear the case with the Court. The advisory jury concluded by majority vote that:

1) The removal of the Fountain Avenue Trees at issue in this matter was not reasonably necessary for the safe maintenance of the pipelines owned by Spectra; and

2) Defendant was not barred from asserting a right to remove the trees by virtue of waiting until the year 2000 to do so.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, when an advisory jury is used, the Court is to set out specific findings of fact and conclusions of law as to the matters submitted to the jury on an advisory basis. In accordance with Rule 52, the Court makes the following findings of fact and conclusions of law as to the issues of whether the Defendant met its burden to demonstrate the reasonable necessity of the removal of the trees and shrubs at issue here and whether the Plaintiffs met their burden to demonstrate that the Defendant was barred by the doctrine of laches from asserting a right to remove the trees.

## II. FINDINGS OF FACT[1]

### A. Stipulated Facts[2]

Defendant, Spectra Energy Company ("Spectra") is a Delaware corporation that has a principal place of business in Houston, Texas. Texas Eastern Transmission, L.P. ("T-E") is a

---

[1] Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law.

[2] The parties submitted stipulated facts at the start of the trial. Slight modifications were made by the Court at the start of trial to simplify the facts for the advisory jury and the modifications were accepted by the parties. (*See* Transcript dated May 20, 2008 at 45-49.) The Court adopts these facts as findings of fact.

2

predecessor entity of Spectra. Texas Eastern was formerly Texas Eastern Transmission Corporation, which was known by the acronym TETCO.

On or about May 6, 1944, the Plaintiffs' predecessor-in-title granted to the Defense Plant Corporation ("Defense Corp.") an easement to "lay, operate, renew, alter, inspect and maintain" two pipelines across property now owned by the Township of Piscataway, New Jersey (the "1944 Grant"). The 1944 Grant was dated May 8, 1944 and recorded on May 16, 1944 in the Middlesex County Clerk's Office.

Pursuant to the 1944 Grant, Defense Corp. constructed two twenty-inch-diameter pipelines across the property. TETCO acquired the Defense Corp.'s rights under the 1944 Grant and the ownership of the two pipelines.

On or about January 28, 1960, Plaintiffs' predecessor-in-title granted to TETCO an easement to "construct, lay, maintain, operate, renew, alter, repair, remove, change the size of, and replace" pipelines across the property at issue in this case (the "1960 Grant"). The 1960 Grant was dated January 28, 1960 and recorded on February 15, 1960 in the Middlesex County Clerk's Office.

Pursuant to the 1960 Grant, TETCO constructed a third thirty-six-inch-diameter pipeline across that same property.

In the early 1960s, Plaintiffs' predecessor in title requested that TETCO release all portions of the easements described in the 1944 Grant and the 1960 Grant not required by it for pipeline purposes. Pursuant to that request, TETCO agreed to modify and reduce the size of the easement described in the 1944 Grant and the 1960 Grant, and define the reduced easement by a metes and bounds description found in an instrument (the "1963 Instrument"), which was

executed by TETCO on January 23, 1963 and also recorded in the Middlesex County Clerk's Office.

T-E, as the successor in interest to TETCO, succeeded to TETCO's rights under the 1944 Grant, the 1960 Grant, the 1963 Instrument, and to the three pipelines. The 1944 Grant and the 1960 Grant, confirmed by the 1963 Instrument, provides Defendant with the express power to "operate," "inspect" and "maintain" the pipelines. Spectra is the successor in interest to T-E and TETCO and owns the easement created by these instruments, as well as the pipelines in question.

The width of the easement is sixty feet, except in the extreme westerly portion where the right-of-way expands to a width of seventy-five feet. Spectra operates the pipelines and maintains the easement in the transportation of natural gas in interstate commerce pursuant to certificates issued by the federal government. In order to be able to inspect, operate and maintain the three pipelines in compliance with the Pipeline Safety Regulations of the United States Department of Transportation and other appropriate safety standards, the Defendant must inspect the pipelines and prepare to make repairs on an emergency basis. The Defendant inspects the pipelines by air and on the ground, and is prepared to make repairs on an emergency basis.

As a natural gas pipeline company, Spectra is vested with the right of eminent domain. No part of the easement crosses the property owned by the individual Plaintiffs and the individual Plaintiffs took title to their respective properties subject to the Defendant's rights under the right-of-way grants.

Defendant conducts regular inspections of the pipelines and the easement on Fountain Avenue. No problems, difficulties, or irregularities have been noted in the pipelines based on these inspections, other than Defendant's alleged need to remove the trees in question in this

case. The Defendant regularly monitors a section of the pipelines in question that run beneath Fountain Avenue through a device inserted into the pipeline. This device seeks to locate any damage or irregularity in the pipeline itself. No damage or irregularity has been identified in the pipelines.

### B.   Additional Findings of Fact

In addition to the stipulated facts adopted above, the Court finds the following additional facts after hearing the testimony at trial.

#### 1.   *Benefits of the trees for Plaintiffs*

Plaintiffs testified about the substantial benefits from the trees at issue in this case. Plaintiff Al Howard testified that the trees cool the residents' homes in the summer, block heavy winds, help with drainage, and provide a sound barrier for traffic on nearby streets. He also noted that the trees provide a habitat for various birds and animals, and help protect yards and gardens from overexposure to sunlight. (Tr. 5/20/08, 75:23-76:18, 78:11-23, 81:4-19.)

Professor Bruce Hamilton was qualified and testified as an expert witness on behalf of the Plaintiffs. Professor Hamilton is a professor of horticulture, forestry and landscape architecture at Rutgers University. He confirmed that the trees serve to cool the neighborhood. He also testified that the trees reduce water run-off, help with drainage, and serve to filter air pollution from the street. Professor Hamilton noted, however, that he had not performed any specific studies of the trees on Fountain Avenue and had not attempted to determine the specific environmental impact of removal of the fifty-five trees in question in the context of the rest of the neighborhood and remaining trees.

Plaintiff Guy Suabedissen testified that the trees provide a place for his children to play. (Tr. 5/20/08, 92:18-19.)  Plaintiff Judy Payne testified that one of the reasons that she and her family purchased their home on Fountain Avenue was because the street was a beautiful tree-lined street and the house would be shaded by the trees. (Tr. 5/20/08, 97:22-98:10.)  Ms. Payne also testified that, in her experience as a realtor, the value of the homes on Fountain Avenue would be drastically reduced if the street trees and other plantings were removed. (Tr. 5/20/08, 100:1-13.)

        2.    *Evidence related to pipeline inspection and maintenance*

Spectra operates approximately 18,000 miles of gas pipelines across the United States. Spectra is a common carrier that transports gas products which are owned and produced by other companies.  The pipelines on Fountain Avenue carry natural gas that originates in the Gulf of Mexico, Texas and Louisiana and is transported to the east coast through pipelines.  The Fountain Avenue pipelines carries natural gas to PSE&G, which then distributes the gas through a series of pipelines and distribution centers to homes and businesses throughout the state of New Jersey. (Testimony of Timothy Vaughn, 5/21/08.)

Defendant presented evidence of a variety of safety and inspection procedures used to ensure the safety of the pipelines.  At the time of installation, the pipelines are treated with a protective coating designed to reduce corrosion.  The two twenty-inch pipelines on Fountain Avenue have a coal-tar coating; the thirty-six inch pipeline has a thick asphalt coating.  Cathodic energy is also used on all pipelines and involves maintaining an electrical current in the steel pipes to prevent corrosion.  The cathodic energy protection system has been in place on the Fountain Avenue pipelines since the mid- to late-1940s.  The pipelines are also inspected using a

"smart pig." This involves running an inline tool through the pipelines to measure the wall thickness of the pipe and to determine if there are any irregularities or degradation of the wall thickness that might affect the pipeline's ability to operate safely. (Testimony of Timothy Vaughn, 5/21/08.)

The pressure in the pipelines is also monitored twenty-four hours a day through a computer monitoring system. There are standard procedures established for detected leaks, which include isolation of the section of the pipeline where the pressure has dropped, shutting off the gas flow, venting the gas from the pipe into the environment, and notifying the local authorities.

Spectra has never discovered any problems with the pipelines on Fountain Avenue through any of these testing measures. The portions of the pipelines running underneath Fountain Avenue have remained in the ground and intact for sixty-four years without having been disturbed, repaired, or replaced. (Tr. 5/21/08, 2.74:23-2.75:7.) Spectra's Area Manager for the Fountain Avenue area, Timothy Vaughn, testified that he had never seen any WWII-era pipelines damaged by tree roots.

In addition to the testing mechanisms, Spectra inspects the pipelines via air and ground patrol. The Spectra air pilot testified that during the portion of the year where the trees have full canopies, he cannot see the ground around the pipeline from the air patrol, but he has a clear view when the leaves are off the trees. (Tr. 5/21/08, 2.174:2-2.175:1, 2.183:15-25.) The air pilot testified that he generally flies over the pipelines in the area three times per week, weather permitting, at between seven hundred and one thousand feet and at approximately one hundred miles per hour. (Tr. 5/21/08, 2.176:18-2.177:7.) He further testified that in all of the right of

ways in New Jersey, Fountain Avenue is one of only three areas where there is an obstructed view of the right of way. (Tr. 5/21/08, 2.185:12-2.186:8.)

Spectra had a formal ground patrol system until 2004, when it was discontinued. Mr. Vaughn testified that walking or foot patrols would enhance the safety of the right of way, but that these were discontinued because of the cost and because "[i]t's not our standard procedure." (Tr. 5/21/08, 2.124-25.) Nonetheless, Donald C. Hargis, a former area manager and supervisor for Spectra, testified that employees are informally instructed to walk or drive the pipelines when they are in the area, but no reporting is required to ensure that this is in fact done.

Mr. Vaughn also testified that the number one threat to pipeline safety is third-party damage or interference. The pipelines have markers indicating their presence and Spectra engages in public education measures such as mailings to residents designed to educate residents about the pipeline. Linda Smith, a right-of-way consultant for Spectra, testified that she has walked the pipeline and spoken to residents. Spectra also participates in a "one call" system designed to alert Spectra if any digging, construction, or excavation will occur near the pipeline. The "one call" system is, in fact, diligently used by the residents of Fountain Avenue.

Spectra is in full compliance with all laws, rules, and regulations related to pipeline safety. Neither Congress nor any regulatory agency has mandated the removal of trees within pipeline easements or right of ways. Defendant called Terry Mock as an expert witness on pipeline safety.[3] Mr. Mock confirmed that Defendant would be in full compliance with all rules and regulations by walking or driving sections of the pipeline right of way where there is an

---

[3] The Court held an evidentiary hearing outside the presence of the advisory jury to determine Mr. Mock's qualifications as an expert witness. His area of expertise was limited to pipeline safety after Mr. Mock testified that he had no expertise or specialized knowledge in horticulture or tree growth.

obstructed aerial view. He also testified that the pipeline easement area on Fountain Avenue could easily be walked by a Spectra employee. Mr. Mock agreed that there was neither evidence that the pipelines underneath Fountain Avenue are unsafe nor that the pipelines were not in the same condition as when they were first buried. Mr. Mock made no effort to inspect the tree roots where similar trees had already been cut down on Fountain Avenue in the vicinity of the pipelines to determine whether the roots of the trees on Fountain Avenue are close to or interfering with the pipelines.

### III.   CONCLUSIONS OF LAW

#### A.   The Definition of "Cultivation" in the Right of Way Grants

The 1960 Right of Way Grant, in pertinent part, provides that Defendant has the right to:

> ...construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace pipelines and appurtenances thereto (including Corrosion Control Equipment) for the transportation of oil, gas, petroleum products or any other liquids, gases, or substances which can be transported through pipelines... and

> ...The said Grantor is to fully use and enjoy the said premises, except for the purposed grant to the said Grantee and provided that said Grantor shall not construct nor permit to be constructed any house, structure or obstructions on or over, or that will interfere with the construction, maintenance or operation of, any pipeline or appurtenance constructed hereunder, and will not change the grade over such pipe line... and

> ...Grantee hereby agrees to bury all pipes to a sufficient depth so as not to interfere with cultivation of soil, and agrees to pay such damages which may arise to growing crops, timber, or fences from the construction, maintenance and operation of said lines.

The Plaintiffs argue that the express language of the 1944 and 1960 Grants contemplates and permits "cultivating" of the land with trees above the easement. "Cultivating" generally means traditional farming. The word dictionary defines "cultivate" to mean "to prepare or

prepare and use for the raising of crops." Webster's Ninth New Collegiate Dictionary. In Bonham & Young Co. v. J.H. Thayer Martin, State Tax Commissioner, 11 A.2d 371, 372 (N.J. Tax. App. 1940), the court accepted the definition of "agriculture" as the "art or science of cultivating the ground, including harvesting crops and rearing and management of the livestock; tillage; husbandry; farming; in a broad sense, the science and art of the production of plants and animals useful to man...".[4]

Plaintiffs respond that the fact that the term "cultivation" was used in the 1960 Grant, when a residential neighborhood was expressly contemplated by the parties, demonstrates that "cultivation" in this context was intended to refer to the sort of cultivation that occurs in residential neighborhoods – the growing of trees, lawns, shrubs, and gardens. Plaintiffs also argue that because this use of the land was known to Defendant's predecessor-in-title and no objections were made, the Court should read "cultivation" to include the trees at issue in this case.

The Court was presented with no evidence that the intent of the parties at the time of the 1960 Grant was to redefine "cultivation" to include residential greenery rather than the agricultural crops that existed on the land before the neighborhood developed. The same "cultivation" language appears in the 1944 Grant when the land was indisputably used for agricultural purposes, and there is no evidence that the parties intended to change the definition of the term at the time the easement was renegotiated in 1960.

   B.   **Removal of Trees and "Drainage" of the Land**

---

[4] The argument by Plaintiffs is also similar to the argument made in Avery v. Colonial Pipeline Company, 444 S.E.2d 363, 366 (Ga. Ct. of Appeals 1994), where the court held that "cultivated land" is "land used to grow crops."

Plaintiffs also argue that Defendant's proposed tree removal, in addition to interfering with "cultivation," will interfere with the "drainage" of the land, in violation of the restrictive covenant. Plaintiffs' expert, Bruce Hamilton, testified that trees help pull water from the ground and thus improve drainage. However, he also noted that he had not done any specific studies of the drainage on Fountain Avenue or the specific effect of the trees at issue. In particular, Defendant seeks removal of approximately fifty-five trees; Fountain Avenue will still have many trees which are not affected by this litigation. Thus, without further evidence related to the effect of the specific trees at issue, Plaintiffs have not demonstrated that the removal of these trees will interfere with the "drainage" of the land such that the removal would run afoul of the language of the 1944 Grant and the 1960 Grant.

### C.   Laches

Plaintiffs argue that Defendant's failure to object to the trees on Fountain Avenue from the time they were planted in the 1960s until the late 1990s should preclude Defendant from objecting now. Under New Jersey law, laches is "an equitable defense that may be interposed in the absence of the statute of limitations." Lavin v. Bd. of Educ., 447 A.2d 516, 523 (N.J. 1982). "Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." Knorr v. Smeal, 836 A.2d 794, 800 (N.J. 2003). "The key factors to be considered in deciding whether to apply the doctrine are length of the delay, the reasons for the delay, and the 'changing conditions of either or both parties during the delay.'" Id. (quoting Lavin, 447 A.2d at 520).

Defendant argues that changing safety standards and the increased importance of aerial surveillance, as well as changes to the trees as they have grown, explain the delay in seeking to remove the trees. Defendant also argues that it has attempted to be a "good neighbor" and avoid the necessity of interfering with a landowner's property until such time as trees or other obstructions clearly interfered with pipeline inspection or when enhanced safety standards were in place and followed.

Plaintiffs have the burden of proof on laches. Plaintiffs essentially argue that the fact that the trees were planted with Defendant's knowledge that suburban homes were being built and the length of the delay is sufficient to establish the first prong of the test for laches. Plaintiffs did not adduce evidence to show that Defendant had abandoned its rights. The evidence at trial demonstrated that Defendant actively maintains the easement and the pipeline, has put markers along the pipeline, and engages in various pipeline maintenance. Moreover, Defendant did adduce evidence that pipeline inspection practices now use more air surveillance in the many decades since the trees were first planted.

The issue of prejudice cuts both ways. On the one hand, Plaintiffs have benefitted from the delay, as is indicated by the testimony of the Plaintiffs as to how much they have enjoyed the trees. On the other hand, Plaintiffs have relied on the presence of the trees. Ms. Payne testified that the trees on Fountain Avenue contributed to her decision to purchase a home there. She also testified that, in her experience as a real estate agent, she believed that the value of the homes on Fountain Avenue would be decreased if the trees were removed. Other witnesses testified to the environmental impact of the removal of the trees.

Plaintiffs have not adduced sufficient evidence to meet their burden to demonstrate that the delay in removing the trees is unreasonable in the context of this case, nor have they met their burden to demonstrate prejudice based on the delay. Defendant offers plausible reasons to excuse the delay, including the change in the trees themselves as they have grown larger and their canopies denser as well as the increased use of aerial surveillance. Plaintiffs also offer no evidence to demonstrate that Defendant has abandoned its rights.

**D.     Reasonable Necessity**

The right to remove the trees at issue depends on the rights granted in the easement to inspect and maintain the pipelines. Easement holders have only those rights that are required in order to fully enjoy the benefits of their easement without unduly burdening the property owner. Tide-water Pipe Co. v. Blair Holding, 42 N.J. 591 (1964). "In order that the easement use shall not unreasonably interfere with the use of, or increase the burden upon, the landowner, it shall be exercised, not in the manner determined by the mere convenience of the easement holder, but only in a way which is reasonably necessary for its own enjoyment." Id. at 605; see also Lidgerwood Estates Inc. v. Public Serv. Elec. & Gas Co., 132 N.J. Eq. 403 (Ch. Div. 1933).

The parties agreed at the outset of the trial that the Defendant has the burden of proof to demonstrate that removal of the trees on Fountain Avenue is reasonably necessary to the right to inspect and maintain the pipelines, and does not unduly burden the adjacent property owner.[5] Plaintiffs presented evidence that the trees have a positive environmental and economic benefit to the residents of Fountain Avenue. Defendant made no effort to contradict this evidence.

---

[5] All issues of standing by the property owners were resolved in the prior rulings, and affirmed by the Third Circuit.

Instead, Defendant argues that removal of the trees is required for the safe maintenance of the pipelines, and particularly to allow an unobstructed aerial view of the pipelines. Defendant also argues that tree roots might interfere with the pipelines or that the trees would delay access to the pipes in emergency situations.

Insubstantial evidence was adduced to support the "emergency access" argument. Defendant's witnesses conceded that in an emergency situation it would take significant time to evacuate residents, shut off the pipe valves, and bleed pressure from the pipes before repair work could be safely commenced. The Fountain Avenue trees are not a prime source of delay in accessing the pipes, nor would their removal substantially reduce delays in a hypothetical future emergency.

The 1960 Grant prohibits Plaintiffs from "construct[ing] []or permit[ing] to be constructed any house, structure or obstructions on or over, or that will interfere with the construction, maintenance or operation of, any pipeline." Thus, Defendant argues that the trees at issue are obstructions over the pipelines, and that, therefore, Defendant has the right to remove the trees. This argument turns on the question of reasonable necessity. Defendant is permitted to remove only those obstructions that "interfere with the construction, maintenance, or operation of, any pipeline." To determine whether an obstruction "interferes," the Court must return to the question of whether it is "reasonably necessary" to remove the obstruction to maintain the pipeline. No actual evidence that the roots of the disputed Fountain Avenue trees are in any way close to or interfering with these pipelines was presented nor have studies or tests been done by Spectra to determine if the roots of the trees that have already been cut down were growing near the pipes.

14

Defendant argues that the company is required to establish safety standards, and that the Defendant's established safety standards (Standard Operating Procedures or "SOPs") require the clearing of trees and other obstructing vegetation from the entire width of the rights of way to facilitate aerial inspection, and that therefore the removal of the trees is reasonably necessary. This argument is circular. No federal or state laws or regulations require pipelines to be inspected by air in all instances. The Defendant chose aerial inspection for its Standard Operating Procedures, but these procedures are simply the ones selected by Defendant. Nothing in federal regulations mandates these particular SOPs. The test of "reasonable necessity" is not defined by the Defendant's choice of its own SOPs regarding the manner of inspection, but rather looks to whether there is a feasible, safe and practical manner of inspection of the pipelines that can be done without removing the trees. In other words, can the inspection and maintenance benefits of the easement be done without unduly burdening the property owner by tree-stripping.

Defendant cites <u>Village of Pine Run v. South Jersey Gas Co.</u>, 215 N.J. Super. 54, 60-61 (App. Div. 1987), for the proposition that a public utility, as operator of gas transmission facilities, can adopt safety standards exceeding the federal standard for minimum pipeline safety set by the DOT. That case is inapposite here, because Defendant has not adduced evidence by a preponderance that aerial inspection exceeds the safety of ground patrol inspection on the Fountain Avenue block. Nothing in this opinion prevents Defendant from adopting higher safety standards than those established by the federal regulations. Any SOP's adopted must be reasonably necessary to the inspection and maintenance of the pipelines, pursuant to the easement's terms.

Defendant's own witness testified that adding driving and walking patrols to the aerial SOPs would improve pipeline safety. The fact that Defendant, for economic or "efficiency" reasons, wishes to eliminate ground patrols and replace them with aerial patrols does not end the inquiry. Thus, while Defendant is certainly permitted to choose an aerial patrol method, Defendant would be equally within safety guidelines by using a supplemental ground patrol on the one block of Fountain Avenue during the six months of the year when foliage is on the trees. The aerial patrol would show the "macro" area around Fountain Avenue, to see if construction was heading toward the vicinity of Fountain Avenue, and ground patrol would show any disturbance to the street, ground, grass and plants on Fountain Avenue itself. The burden of supplementing air patrols with a one block ground patrol is minimal; Fountain Avenue is a short block near one of Defendant's offices. Defendant's employees regularly go by the street. The pipeline area is readily visible right form the public street, and does not require a person even to walk into a backyard. Moreover, there are only three spots in all of New Jersey that would conceivably require ground patrolling in addition to aerial patrols.[6] Thus, reasonable ground patrol supplementation for this one block during half the year does not supplant Spectra's aerial patrol SOPs nor impose significant cost. Indeed, Spectra's own witnesses testified that they already ask their employees to drive and walk via Fountain Avenue while they are engaged in their regular duties for Spectra.

Defendant has failed to adduce evidence to demonstrate that the removal of the trees is reasonably necessary to its enjoyment of the easement, and the prophylactic removal of the trees

---

[6] Nothing in this opinion establishes a precedent for this type of inspection in such other areas because the feasibility and burden of ground patrol supplementation is location specific.

unduly burdens the property owner when a safe and effective inspection system exists that does not require all trees to be cut down. While Defendant has presented arguments about the convenience of aerial surveillance of the pipeline easement, Defendant's witnesses have also testified that the pipelines can be safely maintained by driving and foot patrols from the Spectra office that is very close to Fountain Avenue.

Finally, Defendant has adduced no evidence that the roots of the trees at issue in this litigation are actually likely to interfere with or endanger the natural gas pipelines on Fountain Avenue. This case is clearly about methods of inspection rather than any reasonable likelihood of actual danger. The Defendant does not now have formal ground patrols during the six months of the year when foliage limits aerial surveillance; if there were any genuine concern about actual danger from the tree roots themselves, expert tests would have been done and formalized ground patrols would have been put in place. The choice to inspect by air is not changed by this opinion, which solely requires supplementation by ground patrol that is not burdensome to Spectra and is equally safe.

### IV. CONCLUSION

For the reasons stated above, the Court finds that Defendant has failed to meet its burden to show that the removal of the trees and vegetation on Fountain Avenue is reasonably necessary to inspect and maintain the pipelines. The Court also finds that Plaintiffs have failed to meet their burden to show that Defendant should be prohibited from seeking to remove the trees on the basis of laches. Thus, the Court adopts the findings of the majority vote of the advisory jury. An appropriate Order shall issue.

/s/ Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**